**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**SHONTENA K. ELLIOTT, INDIVIDUALLY and as
PERSONAL REPRESENTATIVE ON BEHALF OF
THE WRONGFUL DEATH BENEFICIARIES OF
JONATHAN SCOTT KEEN**                                                         **PLAINTIFFS**

**v.**                                                        **Civil Action No.: 3:16-cv-00088-MPM-JMV**

**MANAGEMENT & TRAINING CORPORATION, et al.**                           **DEFENDANTS**

<u>**ORDER**</u>

This matter comes before the Court on defendant Management & Training Corporation's ("MTC") *Motion for Summary Judgment* [78] and plaintiff Shontena K. Elliott's ("Elliott") *Motion for Partial Summary Judgment* [82]. The motions have been fully briefed by the parties, and the Court, having reviewed the parties' submissions and relevant authorities, is now prepared to rule.

**Factual Background**

This case involves the tragic death of Jonathan Scott Keen. After a jury in Madison County, Mississippi, found Keen guilty of capital murder, he was sentenced to serve a life sentence in the custody of the Mississippi Department of Corrections ("MDOC") without the possibility of parole or probation. Keen was initially processed into the Central Mississippi Correctional Facility. He was thereafter transferred to Walnut Grove Correctional Facility and then Parchman before being moved to the Marshall County Correctional Facility ("MCCF") on October 14, 2014. Just over eight months later, Keen committed suicide. He was found in his cell at MCCF on June 16, 2015, shortly before 7:00 pm, having hung himself with his prison jumpsuit. Efforts by staff members to resuscitate him were unsuccessful, and Keen was pronounced dead shortly thereafter.

1

Management & Training Corporation ("MTC") is a national for-profit prison operator that operates and oversees multiple prisons across the country. At the time of Keen's death, MTC was under contract with MDOC to provide management and oversight of the daily operations at MCCF. Health Assurance, LLC ("HALLC") is a for-profit company that operated and staffed the medical department at MCCF at the time of Keen's death.

During the several months preceding his death, Keen engaged in extremely abnormal behavior. On March 3, 2015, Keen was brought to the facility's medical department, where he was seen by medical assistant Lisa Davis. Davis' report from that examination states:

> Offender brought to medical due to erratic behavior. States he was high on ICE. Had razor blade threatening to cut himself and also had bedding and some clothing tied in knots. Offender barricaded himself in his cell. Security was finally able to get inmate to come out of cell. Offender states "I'm not trying to kill myself I'm in fear for my life". Inmate states "I'm in fear for my life, that's why I had the blame on me". No visible injuries noted upon visual assessment. No c/o voiced at this time. Security escorted to Ad-Seg.

A few days later, on March 13, 2015, Keen actually did cut himself on the neck with a razor and was again brought to the medical department, where he was seen by a nurse and then by Steven Vance—a mental health technician—and Wayne Lancaster—a psychologist. The medical records indicate that when Keen arrived at the medical department, his hands were covered with blood and he had large lacerations on his neck. During this examination, Keen told Vance that he was not trying to kill himself but that he was trying to get attention and wanted to be moved to the long term segregation unit because a prison gang—the Vice Lords—had a KOS (kill on sight) on him.

On March 24, 2015, Keen again cut himself on the neck and was brought to the medical department. The nurse's report from her examination that day states that Keen told her "I cut

myself on the back of the neck to draw some blood so I could get somebody's attention. The Vice Lords are after me."

Thereafter, on April 15, 2015, Keen requested to be taken to the medical department, where he was again seen by Vance. Vance's notes from that visit provide that Keen requested "to speak with [an] officer regarding security related matters." After this visit, Vance completed a "Suicide Potential Screening", wherein he made several notations indicating that he did not believe Keen was a suicide risk at the time.

Just two days later, on April 17, 2015, at approximately 11:30 am, Keen began complaining of chest pains and was taken to the medical department, where he was first seen by Natasha Gibbs—a licensed practical nurse. In part, Gibbs' notes for that examination state that "[u]pon arrival inmated [sic] stated '[I] wasn't having chest pain, [I] just said that to get up here to talk to Mr. Vance.' Inmate denied chest pain at this time." Keen was then seen again by Vance, who noted that Keen informed him that he did not want to kill himself but that he was not going to let anybody else kill him. Moreover, Keen "reported not being suicidal and made such statement in front of internal affairs officer as well as [Vance]. [Keen] admitted to recently smoking THC." Vance's notes also reflect that he recommended that Keen be placed on property restriction at that time.

Less than two hours later, at approximately 12:55 pm on April 17, 2015, Keen was brought back to the medical department after utilizing a razor to cut himself again. Phyllis Mason, the nurse who examined Keen at this time, noted that Keen made the following statement to her: "I cut myself cause, I just don't care no more. Them folk gonna kill me." In another visit to the medical department four days later, on April 21, 2015, Vance noted that Keen appeared to be suffering from paranoia.

Over the following approximately two months—until June 15, 2016, Keen visited the medical department at least two other times and reported different physical issues. However, the issues Keen complained of during these visits do not appear to have been based upon his own harmful conduct to himself, like many of his previous visits had been.

In contrast, on the night of June 15, 2015, shortly before 9:00 pm, Keen was brought to the medical department after again making superficial cuts to his neck. Elizabeth Mason, the nurse who saw Keen when he first arrived at the medical department, noted that Keen informed her "I'm gonna keep on doing this to myself until somebody listens to me. I need to be off this zone." Keen was then examined again by Vance, who noted that:

> **Subjective:** "I'm not suicidal but I feel like my life is in danger." "I want PC [protective custody]." "I eat five benadrayl [sic] last night and I did 3 grams of ice Thursday night and Friday." "They have been threatening me, I can't deal with the threats." "The doctor said he was going to give me some medicine and I am ready for it." "They says the chief wants me off the compound." "I cut myself to get off the zone." "I've been sleeping with my door tied down for over a week." "The police will not help me!" [Keen] provided written statement confirming he is not suicidal. [Vance] meet [sic] with Lt. Blake and recommended [Keen] be place [sic] on security level property restriction. No [suicidal ideation/homicidal ideation] observed or stated.

As this report makes clear, Vance recommended to Lieutenant Cathy Blake that Keen be placed on property restriction at this time. Keen was then returned to his cell. The following day—June 16, 2015, Keen again cut his neck at approximately 10:30 am and was seen by a nurse, Elizabeth Jackson, who noted that Keen stated "I cut my own self, I'd rather cut myself than have the ones that are trying to kill me do it." As with the other visits to the medical department, Keen was then seen by Vance. Vance's notes from that visit provide that Keen again expressed that he did not want to kill himself but that he wanted to be moved. Shortly after being taken back to his cell, Keen was brought to the medical department after he cut his neck

4

again. As with each of his other previous visits, Keen informed personnel that he was not suicidal but that he wanted to be placed in protective custody.

Upon examining Keen at this time, Vance concluded that Lieutenant Blake did not issue and implement the property restriction, as he had recommended the previous day, based upon the fact that Keen obviously still had access to a razor.[1] As to this issue, the investigative report states that "Correctional Lieutenant Cathy Blake was interviewed and she stated on 6/15/15, she ensured all of Inmate Keens [sic] property was taken after she was ordered to remove it by Mr. Vance. *Lt. Blake stated she did not complete the paperwork necessary to place an Inmate on property restriction on 6/15/15*. Lt. Blake stated it was unusual however, Mr. Vance ordered her to remove Inmate Keens [sic] property and give him a paper gown without placing him on suicide watch." (emphasis added). The investigative report further states that Correctional Sergeant Karsten Randall was assigned to work the cell block where Keen was located on June 16, 2015 (the following day), but she stated that "nobody from the off going shift informed her Inmate Keen was placed on property restriction." Therefore, despite the fact that Keen was supposed to be placed on property restriction, he was permitted to keep his prison jumpsuit after each of his visits to the medical department on June 16, 2015, because the staff working at that time was unaware that he had been placed on property restriction. If the property restriction had been properly carried out in accordance with MTC policy, Keen would not have been permitted to retain his jumpsuit at that time, and the only items he would have been allowed to keep in his cell would have been a paper smock, underwear, and a mattress.

---

[1] Vance documented the failure of MTC staff to implement the property restriction. His note, which was drafted on June 16, 2015, specifically states that he "consulted with Lt. Blake and it was agreed upon to shack [sic] [Keen's] cell down and implement security level property restriction. Apparently, this did not occur evident in [Keen] being brought to medical at approximately 11am today due to self-inflicted superficial cuts to his neck."

Moreover, the investigative report also specifically states that after Vance's second session with Keen on June 16, 2015, "he spoke with Warden Doty and explained to her his rationale, and why he recommended property restriction. Mr. Vance stated Warden Doty told him security staff would take care of the situation and Inmate Keens [sic] numerous 'cries' for help." Shortly thereafter, Keen himself was brought to Deputy Warden Doty's office. When Keen arrived, he was still wearing his prison jumpsuit. Warden Doty spoke briefly with Keen and offered him "material related to the Alcohol and Drug program offered at the facility[]" and then ordered that he be taken back to his cell. Warden Doty avers that she ordered Captain Carlotta Jones to have Keen's property removed from his cell. This order was, of course, not carried out.

Later that day, Keen broke the sprinkler head on the ceiling in his cell, causing it to flood. A Rule Violation Report ("RVR") was prepared, which charged Keen with destructive behavior. When three officers—Correctional Sergeant Joy Cocke, Correctional Officer Barry Payne, and Correctional Officer Eddie Williams—brought the RVR to Keen to explain the charges to him, they found Keen hanging by his prison jumpsuit in his cell. Their efforts to resuscitate him were unsuccessful. Keen was pronounced dead less than an hour later.

A few days later, Sergeant Cocke, Lieutenant Blake, and Captain Jimmy Brooks each received a notice of caution based upon their conduct in connection with Keen's death. Sergeant Cocke was cited for failure to ensure proper security rounds were conducted at the time immediately before Keen's death. Lieutenant Blake's citation was for failure to properly complete the paperwork associated with instituting the property restriction. Finally, Captain Jimmy Brooks was cited for failure to comply with an order that he take the property restriction

6

form to the unit where Keen's cell was located. Thus, each of their citations were based upon their failure to properly implement the property restriction.

On May 12, 2016, Elliott, individually and as personal representative on behalf of Keen's wrongful death beneficiaries, filed the present action against HALLC and MTC.[2] On June 23, 2017, HALLC informed the Court that it had reached a settlement with Elliott as to her claims against it, leaving MTC as the sole remaining defendant.

In her amended complaint, Elliott asserts against MTC a Section 1983 claim for violation of Keen's Eighth Amendment rights, alleging that MTC "acted with deliberate indifference" regarding Keen's conditions of confinement. She also alleges negligence/gross negligence and negligent hiring against MTC.

On June 12, 2017, MTC filed its motion for summary judgment, averring that each of Elliott's claims against it should be dismissed. The following day, Elliott filed her motion for partial summary judgment, arguing that summary judgment should be granted in her favor on her negligence claim. Having reviewed those submissions, in addition to relevant evidence, case law, and other authorities, and for the reasons set forth below, the Court finds that neither of the motions is well-taken. Accordingly, both motions will be denied.

### Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the summary judgment stage, the court must

---

[2] While the medical department employees, including the nurses and Vance, were all employed by HALLC, the members of the prison staff were MTC employees.

"draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Once the moving party shows there is no genuine dispute as to any material fact, the nonmoving party "must come forward with specific facts showing a genuine factual issue for trial." *Harris ex rel. Harris v. Pontotoc Cty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). "If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted." *Little*, 37 F.3d at 1075.

### Discussion

The Court will first consider the merits of MTC's motion and will thereafter turn to the substance of Elliott's motion.

#### *MTC's Motion for Summary Judgment [78]:*

As mentioned above, Elliott has asserted a Section 1983 claim for violation of Keen's Eighth Amendment rights, along with state law claims for negligence/gross negligence and negligent hiring and supervision. The Court will address MTC's arguments for summary judgment on each of these claims in turn.

*Section 1983 claim:*

"Section 1983 provides a cause of action against any person who, under color of law, deprives another of 'any rights, privileges or immunities secured by the Constitution and laws.'" *Bates v. Amite Cty., Miss.*, 2012 WL 5829123, *2 (S.D. Miss. Nov. 16, 2012) (citing 42 U.S.C. § 1983). The statute's language makes clear that "Section 1983 'is not itself a source of

8

substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Therefore, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989)) (additional citation omitted).[3]

In order to determine which constitutional right was allegedly infringed in this case, the Court looks to the allegations of Elliott's complaint. In her amended complaint, Elliott contends that MTC's policies, practices, and customs "resulted in numerous, repeated and pervasive deprivations of the Decedent's right to reasonable, adequate and timely medical care, under both the Eighth and Fourteenth Amendments[.]" Thus, Elliott avers that MTC violated the Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment.[4]

"The Eighth Amendment . . . prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter*, 501 U.S. 294, 296-97, 111 S.Ct. 2321, 115

---

[3]  Although the parties do not dispute this fact, the Court notes, for the purpose of clarity, that MTC may be held liable for constitutional violations pursuant to Section 1983, despite the fact that it is a private company, since it is performing a government function that is traditionally reserved to the state. *Rosborough v. Management & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) ("[P]rivate prison-management corporations and their employees may be sued under § 1983 by a prisoner who has suffered a constitutional injury. Clearly, confinement of wrongdoers—though sometimes delegated to private entities—is a fundamentally government function. These corporations and their employees are therefore subject to limitations imposed by the Eighth Amendment.").

[4]  Because Keen had been convicted of a crime and was not merely a pretrial detainee, Elliott properly asserted her claim under the Eighth Amendment, rather than the Fourteenth Amendment. *See Nerren v. Livingston Police Dept.*, 86 F.3d 469, 474 (5th Cir. 1996) ("We contrast pretrial detainees and convicted prisoners because the due process clause of the Fourteenth Amendment accords pretrial detainees rights not enjoyed by convicted inmates under the Eighth Amendment prohibition against cruel and unusual punishment.").

L.Ed.2d 271 (1991) (citing *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962)). While the Court will not repeat the extensive case law concerning the history of the Eighth Amendment, it does note that the United States Supreme Court has held "repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society[]' or which 'involve the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gambl*e, 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citations omitted). In the context applicable in the case at hand, "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Id.* (internal citation omitted).

In order to establish an Eighth Amendment violation, the plaintiff must prove two elements. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id.* (quoting *Wilson*, 501 U.S. at 298). Second, the prison official "must have a 'sufficiently culpable state of mind.'" *Id.*; *see also Herrin v. Treon*, 459 F.Supp.2d 525, 537 (N.D. Tex. 2006) ("Two elements must be satisfied to show that a prison official violated a prisoner's Eighth Amendment right: the alleged deprivation is 'sufficiently serious' and a prison official is deliberately indifferent.").

Regarding the first element, the Court finds that, viewing it objectively, the alleged deprivation is "sufficiently serious." In her amended complaint, Elliott alleges that MTC's actions included "(A) [r]egularly denying, delaying or interfering with inmate requests for medical care; (B) [i]gnoring, delaying or failing to promptly comply with the treatment orders of the doctors; and (C) [n]ot promptly providing reasonable medical care and treatment" and that Keen ultimately was able to commit suicide due to these actions and/or inactions. These allegations are certainly objectively serious. In fact, the Seventh Circuit has adopted a *per se*

10

rule that "[i]n prison suicide cases, the objective element is met by virtue of the suicide itself, as it goes without saying that suicide is a serious harm." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citations omitted). While the parties have not provided—and the Court has been unable to find—Fifth Circuit case law adopting a similar *per se* rule, the Court is convinced that this element is satisfied in the case at bar based upon the allegations of Elliott's complaint and the seriousness of the rights allegedly deprived—namely, unconstitutional conditions of confinement that ultimately provided Keen an opportunity to take his own life.[5]

As to the second element, Elliott must show that the prison official possessed a sufficiently culpable state of mind. "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834. In order to satisfy its burden, the plaintiff must show that the official "(1) ha[d] a subjective knowledge of a substantial risk to an inmate's health or safety, and (2) respond[ed] with deliberate indifference to that risk." *Jones v. Throckmorton Cty., Tex.*, 2004 WL 419811, *4 (N.D. Tex. Mar. 8, 2004) (citing *Jacobs v. W. Feliciana Sheriff's Dept.*, 228 F.3d 388, 394 (5th Cir. 2000)). Consequently, "[n]egligence, clearly, is inadequate to support an eighth amendment claim." *Wilson*, 501 U.S. at 305 (citations omitted).

Moreover, although Elliott has identified a specific constitutional right that was allegedly violated—unconstitutional conditions of confinement in violation of the Eighth Amendment, she still must demonstrate that MTC is liable for it. For the purposes of this analysis, the test for MTC's liability mirrors the test for municipal liability. *See Flores v. GEO Group, Inc.*, 2011 WL 1100491, *3 (W.D. La. Mar. 3, 2011) ("[T]he test to determine liability for a private prison-management corporation under § 1983 is more or less identical to the test employed to determine

---

[5]  The Court notes, however, that this holding should not be interpreted as it adopting the Seventh Circuit's *per se* rule.

11

municipal or local government liability.") (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 208, 56 L.Ed.2d 611 (1978); *Rosborough*, 350 F.3d at 461) (additional citation omitted).

"Municipal liability cannot be sustained under a theory of *respondeat superior*." *Rivera v. Houston Independent Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citing *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997)). Rather, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). In order to prevail against a municipality under Section 1983, the plaintiff must establish three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Piotrowski*, 237 F.3d at 578).[6] These requirements exist "to prevent a collapse of the municipal liability inquiry into a *respondeat superior* analysis." *Id.* at 167. Therefore, because Elliott's claim is against MTC—rather than the individual officers—she must establish a policymaker; an official policy; and that the policy was the moving force in order to prevail. This makes Elliott's burden more strenuous. She must do more than show that a prison official acted with deliberate indifference; rather, she must show that this deliberate indifference arose from an "official policy."

"The first requirement for imposing municipal liability is proof than an official policymaker with actual or constructive knowledge of the constitutional violation acted on behalf

---

[6] *See also Rivera*, 349 F.3d at 247 ("[T]o sustain liability under § 1983, the [plaintiff] must point to more than the action of a [defendant] employee, they must identify a policymaker with final policymaking authority and a policy that is the 'moving force' behind the alleged constitutional violation.").

of the municipality." *Id.* at 167 (citing *Cox v. City of Dallas, Tex.*, 430 F.3d 734, 748-49 (5th Cir. 2005)). "A policymaker is 'one who takes the place of the governing body in a designated area of city administration.'" *Id.* (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). In order to be the policymaker, the individual must "decide the goals for a particular city function and devise the means of achieving those goals." *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984)).

Elliott alleges that Deputy Warden Patricia Doty was MTC's final policymaker. In her brief, Elliott cites to the expert report of Richard Subia, wherein Subia refers to Warden Doty as "one of the highest ranking officials at the facility" and states that one of her responsibilities includes "ensuring staff under her direction maintain strict compliance to facility policies and procedures." In opposition, MTC avers that "Deputy Warden Patricia Doty was not the final policymaker for MTC. . . Deputy Warden Doty's title alone reflects that she cannot be the ***final*** policymaker for MTC[.]" (emphasis in original). The Court notes that minimal evidence has been submitted on this point by the parties. However, it will accept, for the purpose of summary judgment alone, that Warden Doty was a policymaker for MTC. Taking as true Elliott's argument that Warden Doty was "one of the highest ranking officials at the facility," it is conceivable that she was a final policymaker. MTC has done nothing more than argue in conclusory fashion that Warden Doty did not retain sufficient authority to satisfy the final policymaker standard, largely relying upon her job title. The Court finds that this is simply not enough to carry the summary judgment burden. Therefore, for the purposes of the summary judgment motion, the Court will accept that Warden Doty was a final policymaker.

Turning to the second requirement for municipal liability, the Fifth Circuit has defined an "official policy" as "either a policy statement, ordinance, regulation, etc., that has been officially

adopted by a policymaker *or* a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents the municipality's policy." *Cox*, 430 F.3d at 748 (citing *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 289 (5th Cir. 2002)) (emphasis added). However, "[a] plaintiff may also establish a custom or policy based on an isolated decision made in the context of a particular situation if the decision was made by an authorized policymaker in whom final authority rested regarding the action ordered." *Cozzo*, 279 F.3d at 289 (citing *City of Saint Louis v. Praprotnik*, 485 U.S. 112, 124-25, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996)); *see also Brown v. Bryan Cty., Okla.*, 219 F.3d 450, 462 (5th Cir. 2000) ("[A] single decision by a policy maker may, under certain circumstances, constitute a policy for which the County may be liable."). Moreover, "[t]he Supreme Court has recognized that 'there are limited circumstances in which an allegation of a failure to train can be the basis for liability.'" *Burge v. Parish of St. Tammany*, 187 F.3d 452, 472 (5th Cir. 1999) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)) (additional citations omitted). To state these theories of liability more concisely, the Sixth Circuit has provided that "[a] litigant can show a policy or custom through reference to: (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; *or* (4) a custom of tolerance or acquiescence of federal rights violations." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (emphasis added).

Elliott contends that she can survive summary judgment on two of these four theories—specifically, the actions taken by an official with final decision-making authority theory and the failure to properly train or supervise theory.

14

As to her first theory—the actions taken by Warden Doty, Elliott emphasizes that Warden Doty had actual knowledge that Keen had been harming himself despite the fact that he had been placed on property restriction and responded with deliberate indifference by failing to take preventative measures to ensure that Keen did not take additional actions to harm himself. Specifically, she avers that:

> Warden Doty had actual knowledge that Mr. Keen had been harming himself despite being placed on property restriction. Steven Vance testified he was 'frustrated' that correctional officers were not implementing the property restriction. Warden Doty assured Mr. Vance that they would handle [it]. According to MTC's own investigation, Warden Doty was aware that Mr. Keen was able to obtain drugs in his cell. Despite being fully aware of these security failures, ***Warden Doty failed to implement any further restrictive measures against Mr. Keen such as placing him in a suicide cell or investigating exactly why the correctional officers were not implementing the property restriction. Warden Doty simply turned a blind eye to Mr. Keen's condition.***

(internal citations omitted) (emphasis in original). Thus, Elliott avers that Warden Doty's decision to not take additional precautions to protect Keen from harming himself amounted to deliberate indifference. In opposition, MTC avers that while the property restriction was not carried out properly, "the nonfeasance was, at worst, simple negligence."

The Court finds that Elliott survives summary judgment on this point. It is clear that Warden Doty was aware that Keen had inflicted harm upon himself multiple times, even after having been placed on property restriction. In fact, she personally spoke to Keen on the day of his death and simply provided him material on drug and alcohol treatment. Thus, she undoubtedly had subjective awareness of the situation. Whether or not she subjectively appreciated that risk and responded with deliberate indifference is in dispute, but, in the Court's view, Elliott has provided sufficient factual evidence to support her argument on that point. Elliott will obviously bear the burden at trial of persuading the jury that Warden Doty's failure to take additional precautionary measures to ensure Keen's well-being amounted to deliberate

indifference.  However, the Court's function at this stage is only to determine if factual disputes exist.  Because it finds that they do, Elliott survives summary judgment on this theory.

Additionally, Elliott contends that she can establish a claim under the failure to train theory.  The Fifth Circuit has held that municipal liability under Section 1983 "can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations."  *Bryan Cty., Okla.*, 219 F.3d at 459.  To prevail, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."  *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911-12 (5th Cir. 1998)) (additional citations omitted).

Thus, Elliott must first establish that Warden Doty failed to supervise or train her subordinates.   Unlike her first theory, the Court finds that Elliott cannot survive summary judgment on this theory.  While Elliott states in her brief that she "has also alleged that MTC failed to train and supervise its correctional officers[,]" she has provided no evidence on this issue other than the negligent acts of employees in implementing the property restriction.  While a jury may find that the actions of the subordinate officers are sufficient to support a negligence claim, Elliott must establish more than mere negligence based upon *respondeat superior* in order to prevail under her Section 1983 claim for failure to train.[7]  Elliott has provided no evidence whatsoever regarding MTC's training of its officers.  Her failure to come forward with any

---

[7]   The United States Supreme Court has held that permitting a failure to train claim to proceed based upon negligence—rather than a heightened standard—"would result in *de facto respondeat superior* liability[.]"  *City of Canton, Ohio*, 489 U.S. at 392.

evidence on this point precludes her from being able to argue it at trial. This, however, does not affect her ability to proceed on the single act by a policymaker theory discussed above.

The third element for municipal liability requires that the plaintiff show the alleged custom or policy was the "moving force" behind the alleged constitutional deprivation. That is, the plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. However, "[t]his connection must be more than a mere 'but for' coupling between cause and effect." *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992). Rather, "[t]o form the basis of liability under § 1983, a municipal policy must be *affirmatively* linked to the constitutional violation." *Id.* (citing *Polk Cty. v. Dodson*, 454, U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)) (emphasis added).

The parties spent minimal time discussing this issue in their briefs, and the Court likewise finds it unnecessary to expound on this point in great detail, as it finds that Elliott should undoubtedly survive summary judgment on this point. The evidence submitted, at a minimum, is sufficient to create a reasonable argument that Warden Doty's conduct was the moving force behind the alleged constitutional violation. Elliott has satisfied her burden to avoid summary judgment on this point.

Ultimately, Elliott has come forward with sufficient evidence to thwart summary judgment on her Section 1983 claim based upon the single act by a final policymaker theory. Therefore, MTC's request for summary judgment on that claim will be denied.

*State law claims:*

MTC argues that "[e]ach of Plaintiff's state law claims against [it] fail because Keen's suicide acted as the intervening and superseding cause of all injuries." This argument is based upon the common law rule that "suicide constitutes 'an independent, intervening and superseding

17

event that severs the causal nexus between any wrongful action on the part of the defendant.'"
*Truddle v. Baptist Mem. Hosp.-DeSoto, Inc.*, 150 So.3d 692, 697 (Miss. 2014) (quoting
*Shamburger v. Grand Casino of Miss., Inc./Biloxi*, 84 F.Supp.2d 794, 798 (S.D. Miss. 1998)).
There is one exception, however, to this common law rule—the irresistible impulse doctrine.
Recognizing this exception for the first time, the Mississippi Supreme Court held that "where the
suicide is committed in response to an uncontrollable impulse, recovery may be had if the mental
state of deceased was substantially caused by the defendants' intentional wrongful acts, and
whether they were substantial factors in bringing about the death by suicide may be issues for the
jury." *State for Use and Benefit of Richardson v. Edgeworth*, 214 So.2d 579, 587 (Miss. 1968).
The *Edgeworth* court provided the rationale for this rule is that "a higher degree of responsibility
is imposed upon a wrongdoer whose conduct was intended to cause harm than upon one whose
conduct was negligent." *Id.*

Under the irresistible impulse doctrine, in order to recover against a third party for a
decedent's suicide, the plaintiff must show: "(1) the decedent was under an 'irresistible impulse'
rendering him or her unable to discern the nature or consequences of suicide, and (2) the
'irresistible impulse' was proximately caused by the defendant's intentional conduct." *Truddle*,
150 So.3d at 696.

To support its position, MTC relies heavily on the Mississippi Supreme Court's
application of the irresistible impulse doctrine in *Truddle*. In that case, Eric Carmichael was
admitted to Baptist Memorial Hospital complaining of chest pains. *Id.* at 693. After becoming
aggressive and agitated with the Baptist staff, Carmichael was eventually discharged from
Baptist three days later. *Id.* at 694. Prior to Carmichael's discharge, however, his mother,
Diane Truddle, requested that he not be discharged because "he had had an outburst the night

before" and that he had stated "something they gave me [medications] made me crazy." *Id.* However, Carmichael was nevertheless discharged and ultimately committed suicide five days later. *Id.* at 694-95. Diane brought suit against Baptist and the treating physician for medical negligence, wrongful death, gross negligence, and other various state law claims. *Id.* at 695. Summary judgment was granted in the defendants' favor. *Id.* The Mississippi Supreme Court affirmed, applying the common law rule that suicide breaks the chain of causation and finding that the irresistible impulse exception was inapplicable because Diane alleged only negligence against the defendants—not intentional conduct. *Id.* at 697-98.

MTC requests that this Court follow the same analysis and reach the same result. MTC contends that the common law rule that suicide breaks the chain of causation should be applied. Moreover, MTC argues that the irresistible impulse doctrine—which, again, is the only exception to the common law rule—is inapplicable because Elliott cannot show that MTC's conduct was intentional, as required under the doctrine's second element. MTC emphasizes that Elliott's only allegations throughout the course of this litigation have been that it was negligent. Therefore, in MTC's view, since the common law rule applies and the only exception is inapplicable, this case is analogous to *Truddle*, resulting in Elliott's state law claims being barred.

While the Court appreciates MTC's argument, it finds one crucial distinction between *Truddle*—along with other cases that have applied the common law bar and thus analyzed irresistible impulse doctrine exception—and the case before it now. The *Truddle* decedent was not in the defendant's custody at the time of his death. Rather, the decedent had been released from the defendant's custody for almost a week prior to committing suicide. In the case at bar,

19

Keen was never released from MTC's custody, as he was an MTC prisoner at the time he ended his life. This distinction strikes the Court as a critical one.

In fact, there are multiple Mississippi cases holding that a defendant may be held liable for negligence when a patient under the defendant's control commits suicide. *See, e.g., Miss. Dept. of Mental Health v. Hall*, 936 So.2d 917, 924 (Miss. 2006) (permitting a negligence action for mental health patient who attempted suicide by jumping out of third story window); *Miss. State Hosp. v. Wood*, 823 So.2d 598 (Miss. Ct. App. 2002) (permitting wrongful death action based upon negligence when patient committed suicide while in defendant's custody). While the facts of those cases are not completely analogous to the present action, they do highlight one critical point—specifically, whether or not the decedent was in the defendant's custody, or under the defendant's control, at the time the suicide was committed is crucial in the determination of whether the common law rule should be applied.

In the Court's view, the purpose of the rule insulating defendants from liability for negligence in cases where the injured party commits suicide is wholly defeated if applied in cases where the decedent is under the defendant's control at the time he commits suicide. A prison operator should not be permitted to escape liability for its negligence simply because a prisoner chooses to take his own life. This is precisely the harsh result for which MTC advocates. The path that MTC urges the Court to follow strikes it as bad policy and, in the absence of precedent requiring it do so, it simply will not apply the law in such an unjust manner. Accordingly, having found distinguishable the precedent upon which MTC relies, the Court squarely rejects its argument that Elliott's state law claims are barred. The motion will be denied.

*Elliott's Motion for Partial Summary Judgment [82]:*

The Court now turns to Elliott's motion, wherein she claims that summary judgment should be granted in her favor as to her negligence claim. Her claim is based upon vicarious liability, as she avers that MTC's employees were negligent in their conduct leading up to Keen's death and that MTC is ultimately liable for that conduct. She specifically alleges that:

> MTC's employees acted negligently by failing to prevent Mr. Keen's death. It is clear from MTC's own investigation that its employees failed to take Mr. Keen's jumpsuit when he was placed on property restriction and failed to make security checks on him as required by its own policies and procedures. Mr. Keen then used his prison jumpsuit to take his own life using his prison jumpsuit. Numerous supervisors were aware that Mr. Keen was at risk for injuring himself yet failed to make sure his prison jumpsuit was taken away. There is no genuine issue of material fact on this matter.

Of course, the elements of negligence under Mississippi law are well-settled. "The elements of negligence . . . are 1) a duty owed by the defendant to the plaintiff; 2) a breach of that duty; 3) damages; and 4) a causal connection between the breach and the damages, such that the breach is the proximate cause of the damages." *Grisham v. John Q. Long V.F.W. Post, No. 4057, Inc.*, 519 So.2d 413, 416 (Miss. 1988) (citations omitted). "'Negligence is the failure to do what a reasonable person would do under the same or similar circumstances,' resulting in a breach of the applicable standard of care and injury to the plaintiff." *Irby By and Through Collins v. Madakasira*, 2017 WL 1164219, *3 (Miss. Ct. App. Mar. 28, 2017) (quoting *Estate of St. Martin v. Hixson*, 145 So.3d 1124, 1128 (Miss. 2014)). Moreover, Mississippi law provides that "an employer is liable for the negligent acts of its employee done in the course and scope of his employment under the doctrine of *respondeat superior*[.]" *Dorsey v. Tadlock*, 2012 WL 4467267, *2 (N.D. Miss. Sept. 27, 2012).

Elliott highlights the fact that Vance had placed Keen on property restriction on June 15, 2015—the day before Keen tragically ended his own life. As previously mentioned, under

MTC's policy for property restriction, Keen should have been permitted to have *only* a paper smock, underwear, and a mattress. This means, obviously, that he should not have been allowed to keep his prison jumpsuit at that time. Elliott contends that the failure of MTC employees to comply with the property restriction policy conclusively establishes MTC's liability and that she is thus entitled to judgment as a matter of law on her negligence claim.

In its response, MTC makes two main arguments. First, it avers that under the common law, "suicide is an intervening and superseding cause, which breaks the chain of causation in a wrongful death claim." Second, MTC contends that factual issues remain as to Elliott's negligence claim, particularly as to the causation element. MTC's first argument is essentially identical to the argument it made in its own motion, which the Court has already addressed at length and ultimately rejected. To avoid redundancy, it will refrain from repeating that analysis now. However, while the Court is unwilling to find that Elliott's negligence claim is barred based upon the common law suicide rule, it is similarly unwilling to grant summary judgment in her favor on that claim, as factual issues remain in dispute at this time.

As mentioned above, Elliott relies heavily upon the failure of MTC employees to properly implement the property restriction, thus allowing Keen to have access to his jumpsuit. However, while Elliott may bring out at trial MTC's failure to comply with its own policy for implementing a property restriction (presuming it is admissible under the rules of evidence), that non-compliance alone is insufficient to establish negligence. Negligence *per se* is only applicable when the relevant duty is set by statute or ordinance. *See Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 234 (5th Cir. 1983) ("When the doctrine of negligence *per se* applies, the general standard of care of a reasonable man is replaced by a specific rule of conduct established *in a statue or regulation*.") (emphasis added). Thus, because MTC only failed to

comply with its own policy—not a statute or ordinance, its non-compliance does not conclusively establish negligence.[8]

Rather, in order to prevail on her negligence claim, Elliott bears the burden to establish each of the four elements listed above—duty, breach, causation, and damages. While the Court recognizes that Elliott may very well be able to do so at trial, its function at this stage is not to resolve factual disputes but, instead, simply conclude whether such disputes exist. *Kinsella v. OfficeMax, Inc.*, 2017 WL 1274054, *4 (N.D. Miss. Apr. 3, 2017) (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980)) ("At the summary judgment stage, the Court's function is not to resolve factual disputes but, rather, simply determine if such disputes exist.").

In the Court's view, it is exceedingly clear that factual disputes remain at this time. Both parties have emphasized facts that, if proven at trial, could reasonably persuade a jury to rule in their favor. Moreover, the Court also notes that "[w]hile duty constitutes an issue of law, causation is generally a question of fact for the jury." *Colyer v. First United Methodist Church of New Albany*, 214 So.3d 1084, 1090 (Miss. Ct. App. 2016) (citing *Brown v. State Farm Fire & Cas. Co.*, 2007 WL 1657417, *4 (S.D. Miss. June 4, 2007)). Having reviewed the record as a whole and taken into account Mississippi law on this issue, the Court finds that Elliott's motion should be denied.

---

[8]  In her reply, Elliott avers that she has not attempted to proceed under a negligence *per se* theory. She did appear to make that argument in her motion, however, and the Court has addressed it for the purpose of thoroughness.

**Conclusion**

Relying on the foregoing analysis, it is hereby ORDERED that MTC's *Motion for Summary Judgment* [78] and Elliott's *Motion for Partial Summary Judgment* [82] are DENIED.

SO ORDERED, this the 19th day of July, 2017.


**/s/ MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**